**UNITED STATES of America**

v.

**The CITY OF PHILADELPHIA; the Philadelphia Commission On Human Relations; and Barbara W. Mather, Philadelphia City Solicitor.**

**TEMPLE UNIVERSITY OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION**

v.

**The CITY OF PHILADELPHIA Commission On Human Relations.**

Appeal of PHILADELPHIA LESBIAN AND GAY TASK FORCE, Richard Brown, Lesbians and Gays at Penn, Larry Gross, Lois Rothenberger, Jim Bahr, Ken Blochowsky, Peter Antony, Robin Sweeney, and Ilse de Veer, Proposed Intervenor-Defendants.

Appeal of CITY OF PHILADELPHIA; Philadelphia Commission on Human Relations; and Barbara W. Mather, Philadelphia City Solicitor.

Nos. 85–1571, 85–1604.

United States Court of Appeals, Third Circuit.

Argued June 16, 1986.

Decided August 1, 1986.

Susan Shinkman (argued), Deputy City Solicitor, Philadelphia, Pa., for appellants City of Philadelphia, et al.

David W. Webber (argued), Peter Goldberger, Philadelphia, Pa., for proposed intervenors-appellants Philadelphia Lesbian and Gay Task Force, et al.

Robert J. Reinstein (argued), Stephen Bosch, Office of University Counsel, Philadelphia, Pa., for appellee Temple University.

Richard K. Willard, Asst. Atty. Gen., Edward S.G. Dennis, Jr., U.S. Atty., John F. Cordes, Robert V. Zener (argued), Attorneys, Appellate Staff Civ. Div., Dept. of Justice, Washington, D.C., for appellee U.S.; Lt. Col. Joyce E. Peters, Major Thomas R. Folk, Office of the Judge Advocate General, Dept. of the Army, Washington, D.C., of counsel.

Seth Kreimer, University of Pennsylvania Law School, Stefan Presser, Legal Director, American Civil Liberties Union, Philadelphia, Pa., for amicus curiae The American Civil Liberties Union of Greater Philadelphia.

George R. Clark, Diane E. Burkley, Thomas M. Curtis, Pierson, Ball & Dowd, Washington, D.C., for amicus curiae American Council on Educ.; Sheldon Elliot Steinbach, American Council on Educ., Washington, D.C., of counsel.

Abby R. Rubenfeld, Managing Attorney, Lambda Legal Defense and Educ. Fund, Inc., New York City, for amicus curiae Lambda Legal Defense and Educ. Fund, Inc.

Before SEITZ, HUNTER, and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The City of Philadelphia, the Philadelphia Commission on Human Relations, and Barbara W. Mather, the Philadelphia City Solicitor, appeal from a final order of the district court granting summary judgment in favor of the United States of America ("the United States") and Temple University ("Temple"). The Philadelphia Lesbian and Gay Task Force, Lesbians and Gays at Penn, and a number of individuals (collectively "the Task Force") appeal from an order of the district court denying their motion to intervene as defendants. This court has jurisdiction over these appeals by virtue of 28 U.S.C. § 1291.

### I.

#### A. *The Philadelphia Administrative Proceedings*

The Temple School of Law ("the Law School") operates a Placement Office that arranges interviews between its students and prospective employers. Approximately 100 employers accept the Law School's invitation to participate in this program each year, including the Judge Advocate General Corps of the Army, Navy, and Marine Corps (collectively "the J.A.G. Corps"). Participating employers select 75% of the students to be interviewed after screening

their resumes; the remaining 25% are randomly selected by the Placement Office.

In the fall of 1982, two law students, Richard Brown and Loretta DeLoggio, sought interviews with the J.A.G. Corps; neither Brown nor DeLoggio was selected for an interview. Shortly thereafter, they each filed a complaint with the Philadelphia Commission on Human Relations ("the Commission"), alleging that the Law School had violated the Philadelphia Fair Practices Ordinance, Philadelphia Code §§ 9–1101 to 9–1110 ("the Ordinance"), because the Placement Office referred students to employment interviews conducted by the J.A.G. Corps while knowing or having reason to know that the Army, Navy, and Marine Corps do not accept homosexuals as members of the uniformed services.[1] The Commission subsequently issued its own complaint against the Law School, again alleging that it had violated the Ordinance by permitting the J.A.G. Corps to participate in the interviewing process conducted by the Placement Office.

A hearing on the Commission's complaint was held, at which the United States appeared as *amicus curiae* and argued that enforcement of the Ordinance against the Law School based on the hiring practices of the Army and Navy would violate the supremacy clause. The Commission, nonetheless, ordered the Law School to "cease and desist from allowing the use of its Placement Office facilities by the" J.A.G. Corps ("the Order"). In an opinion accompanying the Order, the Commission found that the Law School had committed three "unlawful employment practices": First, it had violated section 9–1103(A)(2) by "establishing, announcing and following the policy of permitting the use of its placement facilities" by representatives of the J.A.G. Corps; second, it had violated section 9–1103(A)(4) by "referring persons for employment" to the J.A.G. Corps; and third, it had violated section 9–1103(A)(7) by "aiding and abetting" the J.A.G. Corps in executing their policy of discriminating against persons based on their sexual orientation.[2]

## B. *The District Court Proceedings*

Shortly after the Commission ordered the Law School to "cease and desist" from cooperating with the J.A.G. Corps, the

---

1. Department of Defense Directive 1332.14 provides, in pertinent part, that:

    Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The presence of such members adversely affects the ability of the Military Services to maintain discipline, good order, and morale; to foster mutual trust and confidence among servicemembers; to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; to recruit and retain members of the Military Services; to maintain the public acceptability of military service; and to prevent breaches of security.

    32 C.F.R. Part 41, App.A. Part 1h; *see also* Uniform Code of Military Justice Art. 125, 10 U.S.C. § 925 (defining the crime of "sodomy" to include "unnatural carnal copulation with another person of the same ... sex"). The Law School stipulated in the district court that at all times pertinent to this litigation it knew, or should have known, of these policies.

2. The Ordinance provides, in pertinent part, that:

    (A) It shall be an unlawful employment practice:

    (2) For any ... employment agency ... to establish, announce or follow a policy of denying or limiting ... the employment ... opportunities, of any individual or group because of ... sexual orientation....

    . . . .

    (4) For any employment agency because of a person's race, color, sex, religion, national origin, ancestry, age or handicap to:

    (a) fail or refuse to classify properly or refer for employment;

    (b) otherwise discriminate against any person.

    . . . .

    (7) For any person to aid, abet, incite, compel or coerce the doing of any unfair employment practice ... or to attempt directly or indirectly to commit any act declared by this Chapter to be an unfair employment practice. Philadelphia Code § 9–1103(A)(2), (4), (7). For purposes of this litigation, the Law School stipulated that its Placement Office constitutes an "employment agency" as defined by the Ordinance. *See id.* § 9–1102(g).

United States filed a complaint in the district court alleging that the Ordinance, as applied to the Law School by the Commission, violated the supremacy clause. At the same time, Temple filed a complaint alleging that the Order violated both the supremacy clause and the first amendment.

The United States and Temple subsequently filed motions for summary judgment. The Commission (and the other named defendants) opposed both motions, and filed a cross-motion for summary judgment.[3] The district court held a hearing on these motions and, at its conclusion, granted summary judgment to the United States and Temple. The court essentially found that the Commission's order constituted an attempt to do indirectly what it was without power to do directly—i.e., "to regulate ... indirectly through Temple University the conduct of the United States, insofar as it adheres to its policy of discrimination against homosexuals." As a result, the district court entered an order prohibiting the Commission from "adjudicating any complaint or taking any adverse action under the [Ordinance] against any person, corporation, association or group based on the Commission's objection to the policy of the United States in discriminating on the basis of sexual orientation in its military recruitment efforts." It is this order that forms the basis for the Commission's appeal in No. 85–1604.

## II.

In the brief opinion accompanying its order, the district court concluded that the supremacy clause prohibits any state or local agency "from interfering with or attempting to frustrate the willingness of private citizens or entities or public entities from participating with the United States to carry out a joint effort protected under the constitution." The Commission and the Task Force, together with the American Civil Liberties Union of Greater Philadelphia ("the A.C.L.U.") and the Lambda Legal Defense and Education Fund, Inc. ("Lambda"), take issue with this conclusion and contend that the district court improperly granted summary judgment to the United States and Temple.

### A.

We emphasize, at the outset, that all parties to this action agree that the Commission cannot directly prohibit the military from recruiting persons on whatever terms it deems appropriate.[4] They sharply disagree, however, as to whether the City of Philadelphia, acting through the Commission, may legally prohibit Temple from making its Law School placement services available to the J.A.G. Corps because of the military's policy of discriminating on the basis of sexual orientation.

The task presently before us, then, is to determine whether the Ordinance, as applied to the Law School by the Order, *"conflicts* with Congressional legislation or with any discernible Congressional policy." *Penn Dairies v. Milk Control Comm'n,* 318 U.S. 261, 271, 63 S.Ct. 617, 622, 87 L.Ed. 748 (1943) (emphasis added). While ostensibly a question of governmental immunity, *see, e.g., id.* at 269, 63 S.Ct. at 620, this issue is perhaps "best understood as posing an issue essentially of federal pre-

---

3. Shortly after the Commission filed its cross-motion for summary judgment, the Task Force sought leave to intervene pursuant to Fed.R.Civ. P. 24. The district court denied this motion without a hearing, stating simply that "[t]he intervenors' interests are adequately represented by the City insofar as this controversy involves Temple University, only." It is this order that forms the basis for the Task Force's appeal in No. 85–1571.

4. Lambda alone asserts that the Commission's Order must be upheld and the district court's order reversed because the federal regulations requiring the mandatory exclusion of homosexuals from uniformed military service are unconstitutional. Since a concession to the contrary was made by the parties to this action, we do not believe that we need reach this contention by an *amicus. Knetsch v. United States,* 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960); *National Comm'n on Egg Nutrition v. FTC,* 570 F.2d 157, 160 n. 3 (7th Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978).

emption." [5]  L. Tribe, *American Constitutional Law* 391 (1978).  Viewed in this light, the Order "conflicts" with federal law if, and to the extent that, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [6]  *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ In conducting this inquiry, we remain mindful of the fact that " [a]n unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous." *Penn Dairies,* 318 U.S. at 275, 63 S.Ct. at 623; cf. *Amalgamated Transit Union, Div. 819 v. Byrne,* 568 F.2d 1025, 1029 (3d Cir.1977) (holding that where a conflict between state and federal law is alleged, it must be "reasonable" to conclude that Congress would have intended to preclude the state law in question, since "it would make little sense to preempt state law in order to serve the purposes underlying federal legislation if Congress itself would not require or admit of preemption of state authority").

## B.

■ Congressional legislation authorizing military recruiting falls into two categories.  First, there is the general Congressional directive that the respective branches of the military "shall conduct intensive recruiting campaigns to obtain enlistments."  10 U.S.C. § 503(a).  Second, there

is the long-standing Congressional policy of encouraging colleges and universities to cooperate with, and open their campuses to, military recruiters.  *See* Department of Defense Authorization Act of 1973, Pub.L. No. 92–436, § 606(a), 86 Stat. 734, 740 (1972) [hereinafter cited as the DDA Act of 1973];  Department of Defense Authorization Act of 1971, Pub.L. No. 91–441, § 510, 84 Stat. 905 (1970) [hereinafter cited as DDA Act of 1971];  *see also* National Aeronautics and Space Administration Authorization Act of 1969, Pub.L. No. 90–373, § 1(h), 82 Stat. 280, 281–82 (1968) (provision cutting off NASA funds to institutions of higher learning that bar military recruiters from their campuses) [hereinafter cited as NASAA Act of 1969].  This legislation, with certain exceptions not relevant here, prohibits the "expenditure of defense funds at institutions of higher learning when recruiting personnel of the Armed Forces are barred by policy or where the institution, as a matter of policy, eliminates ROTC." 118 Cong.Rec. 22,436 (1972) (statement of Rep. Hebert);  *see also* Department of Defense Directive 1322.13, 32 C.F.R. Part 216 (1985) (regulations implementing funding prohibition of DDA Act of 1973).

We believe that only one reasonable conclusion can be drawn from this legislation: Congress considers access to college and university employment facilities by military recruiters to be a matter of paramount importance.  In other words, we think that Congress views such access an integral part of the military's effort to conduct "intensive recruiting campaigns to obtain enlistments."  This conclusion is buttressed

---

**5.**  In the present case, however, it is uncontested that Congress has not explicitly displaced local regulations like the Ordinance.  It is also readily apparent that Congress has not "occupied the field," leaving no room for state or local regulation of employment discrimination.  Quite to the contrary, Congress expressly contemplated that the states would exercise their traditional regulatory powers to prohibit employment discrimination.  *See* 42 U.S.C. §§ 2000e–7, 2000h–4; *New York Gas Light Club v. Carey,* 447 U.S. 54, 67, 100 S.Ct. 2024, 2032, 64 L.Ed.2d 723 (1980).  Under these circumstances, then, state or local laws are preempted only if they conflict with federal law.  *Fidelity Fed. Sav. & Loan*

*Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

**6.**  Such a conflict also arises where "compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).  But, as the Commission aptly points out, the present case presents no conflict in this sense, since Temple has no duty under federal law to cooperate with military recruiters.  *See Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.,* 467 U.S. 461, 471, 104 S.Ct. 2518, 2524, 81 L.Ed.2d 399 (1984).

by the legislative history of these provisions. For example, a committee report accompanying the DDA Act of 1973 states, in pertinent part, that "the Committee believes that [the] national interest is best served by colleges and universities which provide for the full spectrum of opportunity for various career fields, including the military field through the Reserve Officers Training Corps program, and by the opportunity for students to talk to all recruiting sources, including military recruiters." H.R.Rep. No. 92–1149, 92d Cong., 2d Sess. 79 (1972).

Given this interpretation of the funding prohibitions contained in the DDA Acts of 1971 and 1973, and the NASAA Act of 1969, it is obvious that the Commission's Order conflicts with a "discernible Congressional policy." *Penn Dairies*, 318 U.S. at 271, 63 S.Ct. at 622. The Order absolutely prohibits the cooperation that Congress intended this legislation to engender and, as a result, military recruiters are denied the access that Congress deemed critical to their ability to conduct "intensive recruiting campaigns."

■ Nonetheless, the Supreme Court has cautioned that " 'a mere conflict in words is not sufficient'; the question remains whether the 'consequences [of the state regulation] sufficiently injure the objectives of the federal program to require nonrecognition.' " *McCarty v. McCarty*, 453 U.S. 210, 232, 101 S.Ct. 2728, 2741, 69 L.Ed.2d 589 (1981), *quoting Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581–83, 99 S.Ct. 802, 808–809, 59 L.Ed.2d 1 (1979). We interpret this statement to mean, in the present circumstances, that if the Order does not significantly impair the military's ability to recruit doctors, lawyers, and other skilled personnel, the fact that it conflicts with Congress' policy of promoting on-campus recruiting by the military would not permit us to invalidate the Order.

■ In support of its motion for summary judgment, the government introduced two declarations from Lieutenant General Edgar A. Chavarrie, the Deputy Assistant Secretary of Defense for Military Personnel and Force Management, which illustrate the scope of military recruiting in the City of Philadelphia. For example, in his original declaration, Chavarrie stated that the military currently recruits approximately 5,000 persons per year from Philadelphia; he also stated that there are about 840 students enrolled in Reserve Officer Training Corps ("R.O.T.C.") programs at 23 Philadelphia-area colleges and universities. In his supplemental declaration, Chavarrie stated that of the 95 officers recruited by the Navy[7] from Philadelphia-area colleges and universities in 1984, approximately 47% or 45 officers were recruited from contacts established on campus. These 45 officers included 2 doctors, 12 naval aviators, and 11 nuclear propulsion engineers—all skills that are, according to Chavarrie, in short supply throughout the Armed Forces. Chavarrie also stated that, during the last three years, 98% of the Navy's nuclear propulsion engineers were recruited from on-campus contacts. Finally, in the same declaration, Chavarrie stated that, based on these statistics, campus recruiting represents the most effective way to fill the critical shortage of persons possessing these important skills.

Even viewing this evidence in the light most favorable to the Commission, we believe that the government has demonstrated, in the words of the Supreme Court, that the Order has "the potential to frustrate" effective recruiting of skilled personnel in the Philadelphia area. *See McCarty*, 453 U.S. at 232–35, 101 S.Ct. at 2741–42 (hold-

---

7. According to Chavarrie, only the Navy has kept records that indicate whether a given enlistment resulted from an on-campus or off-campus contact. Army records indicate, however, that it recruited 3 lawyers, 6 nurses, and 63 medical officers from Philadelphia-area colleges and universities in 1984. Similarly, Air Force records indicate that it recruited 31 medi-

cal officers and 25 other candidates for officer training school from Philadelphia-area colleges and universities in 1984. Despite the absence of precise statistics, we believe that the conclusion that at least a significant minority of these enlistments resulted from on-campus contacts is not unwarranted.

ing that the community property division of military retired pay has the "potential to frustrate" two major Congressional goals: to provide for the retired service member, and to meet the personnel management needs of the active military forces). Thus, we reject the A.C.L.U.'s assertion that, given the present record, the concerns expressed by Temple and the government are "too speculative to support pre-emption." *Hillsborough County Fla. v. Automated Medical Laboratories,* 471 U.S. 707, 105 S.Ct. 2371, 2379, 85 L.Ed.2d 714 (1985).

We likewise reject the suggestion by the Commission, the A.C.L.U., and the Task Force that we should not consider the effect of the Order on military recruiting outside the context of the Law School's Placement Office. We believe that it is appropriate to consider the Order's effect on military recruiting on Temple's campus generally, as well as its impact on military recruiting on other college and university campuses throughout the City,[8] and the possibility that other jurisdictions may adopt a similar interpretation of their anti-discrimination ordinances.[9] *Cf. City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 639, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973) ("If we were to uphold the Burbank [noise control] ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow."). We cannot conceive of any reason why the Commission would prohibit the military

from recruiting lawyers at Temple, yet permit it to recruit doctors or engineers at the University of Pennsylvania. Nor can we conceive of any reason why other jurisdictions with similar laws would adopt a construction different from that adopted by the Commission. Rather, these considerations simply underscore the fact that the Order has "the potential to frustrate" effective military recruiting, both in Philadelphia and throughout the nation. *McCarty,* 453 U.S. at 233, 101 S.Ct. at 2741.

Finally, while we agree with the A.C.L.U., the Task Force, and Lambda, that, under the DDA Act of 1973 and its predecessor legislation, each college and university retained the "absolute right to determine whether it desires to have any association with the military forces of its country, and this includes the right to determine whether it desires to permit military recruiters ... on its campus," H.R.Rep. No. 92–1149, at 79–80, we do not believe that this detracts from our conclusions that Congress considers on-campus recruiting to be an integral part of its military recruiting policy, and that the Order significantly impairs the military's ability to recruit the skilled personnel it requires.[10]

We conclude, therefore, that the Order conflicts with a clearly discernible Congressional policy concerning military recruitment on the campuses of this nation's colleges and universities. It follows, then, that the Commission cannot enforce the Ordinance against Temple with respect to

8. Given our conclusion that the evidence discussed above satisfies the government's evidentiary burden on summary judgment, we expressly do not consider the likelihood that the Commission would apply the Ordinance to other persons who cooperate with military recruiters by renting them office space, running their advertisements, and so forth. We also intimate no opinion as to whether the application of the Ordinance to such persons would run afoul of the supremacy clause.

9. Lambda has represented to this court that 48 municipalities, 11 counties, and 7 states currently have ordinances that prohibit employment discrimination on the basis of sexual orientation.

10. Likewise, we reject the Task Force's assertion that the fact that Congress chose not to enact such a mandatory "right of access" somehow determines the question before us. *Cf. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. at 155, 102 S.Ct. at 3023 (holding that the conflict between state and federal law "does not evaporate because the [Federal Home Loan Bank] Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts": "the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause 'at its option' and have deprived the lender of the 'flexibility' given it by the Board").

the latter's decision to make its placement facilities available to the J.A.G. Corps.

In reaching this conclusion we freely concede that the issues raised by the Commission are difficult given the traditional importance of the City's interest, under its police power, in eradicating employment discrimination. But our conviction that the Order cannot stand is highlighted by one critical fact: in most (if not all) of the reported cases involving questions of governmental immunity, it was at least theoretically possible for the persons involved to comply with both the state and federal policies involved. For example, the contractor in *Leslie Miller, Inc. v. Arkansas,* 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956) (per curiam), might have obtained a state contractor's license had it applied for one. Similarly, the common carrier in *Public Utils. Comm'n of California v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), might have obtained approval from the state Public Utilities Commission to ship goods on behalf of the military at reduced rates.

In the present case, on the other hand, there is nothing that Temple can do to enable it to permit the military to conduct on-campus interviews. Quite to the contrary, given the Order, Temple is barred from cooperating with the military unless and until the United States changes its employment policy with respect to homosexuals. Under these circumstances, we believe that the Commission has no more right to enforce the Ordinance against Temple than did the Town of Windsor to enforce its building permit regulations against the contractor hired to construct a top-secret federal research facility. *See United States v. Town of Windsor,* 765 F.2d 16, 19 (2d Cir.1985) (holding that the Town of Windsor cannot enforce its building-permit requirements against contractor hired to build addition to nuclear facility, because "the impact of the local regulation would fall directly on the Government and result in classified information being disclosed and a classified area being opened to Town officials").

C.

■ The Commission also argues that the district court's order is unnecessarily broad. The order involved, issued at the behest of the United States, prohibits the Commission from "adjudicating any complaint or taking any adverse action under the [Ordinance] against any person, corporation, association or group based on the Commission's objection to the policy of the United States in discriminating on the basis of sexual orientation in its military recruitment efforts." The crux of the Commission's objection is that this order unnecessarily constrains it in "the dispatch of its own internal affairs." *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

Generally speaking, "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *N.L.R.B. v. Express Pub. Co.,* 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). In addition, an injunction represents the exercise of equitable power by the district court. Thus, "[f]or an appellate court to modify or vacate an injunction there must be a showing of abuse of discretion." *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 141 (3d Cir. 1981).

The present record is, however, barren of any indication that the Commission has taken, or is contemplating taking, action against any other person or entity (other than Temple) based on their cooperation with military recruiters.[11] Quite to the

---

11. The record does indicate, however, that a complaint against the University of Pennsylvania has been filed with the Commission. In it, the Lesbians and Gays at Penn allege that the university violated the Ordinance by referring students to employment interviews conducted by the Navy's Nuclear Propulsion Program. Action on this complaint has been suspended by the Commission pending the outcome of the present appeal.

contrary, the Commission has, in the course of this litigation, repeatedly stated that it does not intend to extend the reach of the Ordinance to prohibit private landlords and the like from cooperating with the military.

Under these circumstances, there is some merit to the Commission's argument that the matter should be remanded to the district court so that a more narrowly worded injunction can be entered. However, the application of the injunction must be limited by the scope of our ruling in this case and, in particular, our reference in footnote 8. So viewed, we conclude that the breadth of the injunctive language employed does not require a remand.

### III.

Finally, we must consider whether the district court erred in denying the Task Force's motion to intervene.

■ The Task Force asserts that it was entitled to intervene as of right under Fed. R.Civ.P. 24(a)(2); alternatively, it asserts that it should have been permitted to intervene permissively under Fed.R.Civ. P. 24(b). Although the parties disagree as to our scope of review of the issue of intervention as of right, we will assume, without deciding, that we review under a plenary standard. Permissive intervention rulings are, of course, reviewed under an abuse of discretion standard.

■ As to its claim to intervene as of right under Rule 24(a)(2), we believe that the Task Force has failed to overcome the "presumption of adequate representation [that] generally arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee." *Commonwealth v. Rizzo*, 530 F.2d 501, 505 (3d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976). The factors asserted by the Task Force do not rise to a level requiring us to reverse the district court's finding that its interests are adequately represented by the Commission. The Task Force's only arguably significant claim is

that the Commission imprudently stipulated to facts that it should not have and that it did not sufficiently challenge certain evidence proffered by the government. But in *Commonwealth v. Rizzo*, we stated that the fact that the intervenors "would have been less prone to agree to the facts and would have taken a different view of the applicable law does not mean that the [defendants] did not adequately represent their interests in the litigation." 530 F.2d at 505, *quoting United States v. Board of School Comm'rs*, 466 F.2d 573, 575 (7th Cir.1972). Thus, we stand by this court's previous statement that "it seems unlikely that anyone could be better situated to defend than the governmental department involved and its officers." *Id.*

■ As to the Task Force's claim to intervene permissively under Rule 24(b), we agree with the Task Force that the district court failed to exercise its discretion in the sense that, at least on the record before this court, it did not address the request presented. *Cf. McKay v. Heyison*, 614 F.2d 899, 907–08 (3d Cir.1980) (reversing and remanding for determination of whether permissive intervention should have been allowed, where district court did not previously rule on question and where appellate court concluded that to permit it would not constitute an abuse of discretion). On appeal, however, we have a duty to determine if such an error was harmless. *See Halderman v. Pennhurst State School & Hosp.*, 612 F.2d 131, 134 (3d Cir.1979) (applying harmless-error analysis to denial of motion to intervene for the purpose of appealing). Since we have considered all of the Task Force's claims in this appeal, we conclude that the denial of its motion to intervene permissively constituted harmless error. *See In re Grand Jury Proceedings in the Matter of Freeman*, 708 F.2d 1571, 1575 (11th Cir.1983) (per curiam) (holding that failure to permit intervention was harmless where the appellate court "considered [the defendants'] claim ... as if the district court had al-

lowed them to intervene"); *Washington State Bldg. & Constr. Trades Council v. Spellman,* 684 F.2d 627, 630 (9th Cir.1982) (holding that the improper denial of motion to intervene did not require a new trial where proposed intervenor was permitted to "participate in the argument on the appeal from the order granting summary judgment, and its contentions were duly considered"), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

## IV.

Accordingly, the order of the district court granting summary judgment to Temple and the United States will be affirmed. Likewise, the order of the district court denying the motion of the Task Force to intervene will be affirmed.