OPINION OF THE COURT
AMBRO, Circuit Judge.
The Solomon Amendment, 10 U.S.C. § 983, requires the United States Department of Defense (“DOD”) to deny federal funding to institutions of higher education that prohibit military representatives access to and assistance for recruiting purposes. Last fall, the Forum for Academic and Institutional Rights, Inc. (“FAIR”),[1] an association of law schools and law faculty, asked the United States District Court for the District of New Jersey to enjoin enforcement of the Solomon Amendment. The District Court denied FAIR’S motion. Forum for Academic & Institutional Rights, Inc. v. Rumsfeld, 291 F.Supp.2d 269 (D.N.J.2003) (“FAIR”). On appeal, we hold that FAIR has demonstrated a likelihood of success on the merits of its First Amendment claims and that it is entitled to preliminary injunctive relief. Accordingly, we reverse.
I. Background Facts[2] and Procedural Posture
A. Law Schools’ Nondiscrimination Policies
Law schools have long maintained formal policies of nondiscrimination that withhold career placement services from employers who exclude employees and applicants based on such factors as race, gender, and religion. In the 1970s law schools began expanding these policies to prohibit discrimination based on sexual orientation as well. In response to this *225 trend the American Association of Law Schools (“AALS”) voted unanimously in 1990 to include sexual orientation as a protected category. As a result, virtually every law school now has a comprehensive policy like the following:
[The] School of Law is committed to a policy of equal opportunity for all students and graduates. The Career Services facilities of this school shall not be available to those employers who discriminate on the grounds of race, color, religion, national origin, sex, handicap or disability, age, or sexual orientation.... Before using any of the Career Services interviewing facilities of this school, an employer shall be required to submit a signed statement certifying that its practices conform to this policy.
B. Congress Passes the Solomon Amendment
The United States military excludes ser-vicemembers based on evidence of homosexual conduct and/or orientation. See 10 U.S.C. § 654.[3] Citing their nondiscrimination policies, some law schools began in the 1980s refusing to provide access and assistance to military recruiters. This caught the attention of members of Congress. In 1994, Representative Gerald Solomon of New York sponsored an amendment to the annual defense appropriation bill that proposed to withhold DOD funding from any educational institution with a policy of denying or effectively preventing the military from obtaining entry to campuses (or access to students on campuses) for recruiting purposes. National Defense Authorization Act for Fiscal Year 1995, Pub.L. No. 103-387 § 558, 108 Stat. 2663, 2776 (1994).
During debate in the House of Representatives, Representative Solomon urged the passage of his amendment “on behalf of military preparedness” because “recruiting is the key to an all-volunteer military.” 140 Cong. Rec. H3861 (daily ed. May 23, 1994). He argued that it was hypocritical for schools to receive federal money while at the same time denying the military access to their campuses: “[T]ell[ ] recipients of Federal money at colleges and universities that if you do not like the Armed Forces, if you do not like its policies, that is fíne. That is your [F]irst [AJmendment right[ ]. But do not expect Federal dollars to support your interference with our military recruiters.” Id. The amendment’s co-sponsor, Representative Richard Pombo of California, said Congress needed to target “policies of ambivalence or hostility to our Nation’s armed services” that are “nothing less than a backhanded slap at the honor and *226 dignity of service in our Nation’s Armed Forces.” Id. at H3863. He urged his colleagues to “send a message over the wall of the ivory tower of higher education” that colleges’ and universities’ “starry-eyed idealism comes with a price. If they are too good-or too righteous-to treat our Nation’s military with the respect it deserves[,] then they may also be too good to receive the generous level of taxpayer dollars presently enjoyed by many institutions of higher education in America.” Id.
Other Representatives opposed the amendment, alleging violations of academic freedom and civil rights. See, e.g., id. at H3862 (Rep. Dellums) (“We should not ... chill or abridge privacy, speech, or conscience by threatening a college with a Federal funds termination because it chose for whatever reason to deny access to military recruiters.... We should not browbeat them ... into becoming involuntary agents of Federal policy.”). In light of Vietnam War-era legislation, rarely invoked, that already granted the DOD discretion to withhold funding from colleges and universities that barred military recruiters, see Pub.L. No. 92-436, § 606, 86 Stat. 734, 740 (1972), the DOD itself objected to the proposed amendment as “unnecessary” and “duplicative.” 140 Cong. Rec. H3864 (Rep. Schroeder) (explaining the DOD’s position). The DOD also feared that withholding funds from universities could be potentially harmful to defense research initiatives. Id. But the House voted for the amendment by a vote of 271 to 126. Id. at H3865. Several months later the Senate approved the defense spending appropriations bill, including Representative Solomon’s amendment, and the “Solomon Amendment” ultimately became law.
C. Subsequent Amendments and Regulatory Interpretations
In 1997 Congress amended the Solomon Amendment by expanding its penalty to include, in addition to DOD funds, funds administered by other federal agencies, including the Departments of Transportation,[4] Labor, Health and Human Services, and Education.[5] Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104-208, § 514(b), 110 Stat. 3009-270 (1996). This amendment was recodified in another amendment in 1999. National Defense Authorization Act for Fiscal Year 2000, Pub.L. No. 106-65, § 549, 113 Stat. 512, 609-11 (1999). DOD regulations have clarified this expansion, penalizing an offending “subelement” of a college or university (¿a, a law school) that prohibits or effectively prevents military recruiting with the loss of federal funding from all of the federal agencies identified in the statute, while withholding from the offending subelement’s parent institution only DOD funds. 32 C.F.R. § 216.3(b)(1).
The 1999 amendment also codified exceptions to the Solomon Amendment’s penalties for schools that (1) have ceased an offending policy or practice, or (2) have a longstanding religious-based policy of pacifism. § 549, 113 Stat. at 610(c) (codified at 10 U.S.C. § 983(c)). DOD regulations subsequently added a third exception for schools that provide military recruiters a degree of access equal to that provided to other recruiters. 32 C.F.R. § 216.4(c).
*227 Following the 1999 amendment, the DOD enforced the Solomon Amendment consistent with its terms. Only schools whose policies or practices “prohibitfed], or in effect prevented],” military representatives “from gaining entry to campuses, or access to students ... on campuses for purposes of military recruiting,” were penalized. Thus, by merely allowing military recruiters to gain access to campuses, many law schools avoided the Solomon Amendment’s penalty while reaffirming their opposition to the military’s exclusionary employment policy by not providing them affirmative assistance in the manner provided to other recruiters. Harvard Law School, for example, allowed military recruiters on campus to recruit at the offices of its Veterans Association but did not volunteer its placement personnel to arrange interviews. Boston College Law School allowed military recruiters to conduct on-campus interviews, but kept their literature in the library rather than in the career services office. Until the fall of 2001, the DOD did not consider these and other similar “ameliorative measures” to violate the Solomon Amendment and expressed enthusiasm for the law schools’ cooperation with what it described as successful recruiting efforts. See FAIR, 291 F.Supp.2d at 282 (citing record evidence).
But following the terrorist attacks in the United States in September 2001, the DOD began applying an informal policy of requiring not only access to campuses, but treatment equal to that accorded other recruiters. As evidence of this informal policy, a letter from the DOD’s Acting Deputy Undersecretary William J. Carr to Richard Levin, the President of Yale University, stated that universities are required “to provide military recruiters access to students equal in quality and scope to that provided to other recruiters.”[6] The same letter stated that the “DOD requires that there not be a substantial disparity in the treatment of military recruiters as compared to other potential employers.” This changed context meant that Yale’s willingness to let military recruiters use a room in Yale Law School’s building for interviews would not pass muster unless it also provided military recruiters with the same level of assistance from its career development office (arranging interviews, posting notices, etc.) provided to other recruiters. Furthermore, the DOD intimated that failure to comply would result in a loss to Yale University not only of DOD funds, but of all federal funds (a penalty that is not consistent with the DOD’s existing regulations, under which the offending subelement’s parent institution is penalized with the loss of only DOD funds, see 32 C.F.R. § 216.3(b)(1)).
In another example, the DOD advised the University of Southern California Law School in 2002 that its past practice of accommodating military recruiters-providing them with standard employer information, referring them to the campus ROTC office for scheduling of interview office space, posting notices in the weekly newsletter for students, and making military recruitment materials available to students-would violate the Solomon Amendment unless its career services office invited military recruiters to participate in an off-campus job fair open to other employers. According to the DOD, anything less than equal treatment for military recruiters “sends the message that employment *228 in the Armed Forces is less honorable or desirable than employment with other organizations”-a dangerous message to be sending “in today’s military climate.” In light of the millions of dollars at stake, every law school that receives federal funds had, by the 2003 recruiting season, suspended its nondiscrimination policy as applied to military recruiters.
This past summer Congress amended the Solomon Amendment to codify the DOD’s informal policy. Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub.L. No. 108-375, § 552, 118 Stat. 1811, 1911 (2004). Now, under the terms of the statute itself, law schools and their parent institutions are penalized for preventing military representatives from gaining entry to campuses for the purpose of military recruiting “in a manner that is at least equal in quality and scope to the [degree of] access to campuses and to students that is provided to any other employer.” 10 U.S.C. § 983(b).
D. Current Litigation
In September 2003, FAIR sued the DOD and the other federal departments whose funds are restricted under the Solomon Amendment, seeking on constitutional grounds a preliminary injunction enjoining enforcement of the statute and the then-existing (now codified) informal policy. The Government defendants moved to dismiss for lack of standing. The District Court denied both the motion to dismiss and FAIR’S motion for preliminary injunction. See FAIR, 291 F.Supp.2d at 296, 322. This appeal followed.
II. Jurisdiction
Under 28 U.S.C. § 1331, a federal district court has original subject matter jurisdiction over an action for injunctive relief based on constitutional claims. Tenafly Eruv Ass’n v. Borough of Tenafly, 309 F.3d 144, 156 n. 12 (3d Cir.2002), cert. denied, 539 U.S. 942, 123 S.Ct. 2609, 156 L.Ed.2d 628 (2003).[7] Our appellate jurisdiction exists under 28 U.S.C. § 1292(a)(1).
III. Analysis
To obtain a preliminary injunction FAIR must establish (1) a reasonable likelihood of success on the merits, (2) irreparable harm absent the injunction, (3) that the harm to FAIR absent the injunction outweighs the harm to the Government of granting it, and (4) that the injunction serves the public interest. Tenafly Eruv Ass’n, 309 F.3d at 157. While we review a district court’s balancing of the preliminary injunction factors for abuse of discretion, we review “any determination that is a prerequisite to the issuance of an injunction ... according to the standard applicable to that particular determination.” Id. at 156 (citations omitted). Thus, because the District Court’s *229 ruling was based on its application of the First Amendment and other constitutional principles to the Solomon Amendment-issues of law to which a plenary standard of review applies-our review is plenary. Id.
A. Unconstitutional Conditions Doctrine
FAIR argues that the Solomon Amendment is an unconstitutional condition.[8] Under the unconstitutional conditions doctrine, the Government “may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech.” Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If Congress “could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.” Id. Put another way, the Government may not propose a penalty to “produce a result which [it] could not command directly.” Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (state could not condition property tax exemption on loyalty oath); see also Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (public university could not condition funds for student publications on their secular perspective); FCC v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (FCC could not condition federal funds to radio stations on editorial content). Thus, if the law schools’ compliance with the Solomon Amendment compromises their First Amendment rights, the statute is an unconstitutional condition.[9]
B. First Amendment Analysis
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const. amend. I. This simple commandment plays out differently depending on *230 the avenue of analysis. Two avenues applicable here are: (1) whether the law schools are “expressive associations” whose First Amendment right to disseminate their chosen message is impaired by the inclusion of military recruiters on their campuses; and (2) whether the law schools are insulated by free speech protections from being compelled to assist military recruiters in the expressive act of recruiting.[10]
A violation of freedom of speech under either analytical approach draws down the curtain on Solomon Amendment enforcement unless the Government can establish that the statute withstands strict scrutiny. The levels of scrutiny applicable in the First Amendment context are crucial. A regulation that disrupts an expressive association or compels speech must be narrowly tailored to serve a compelling governmental interest, and must use the least restrictive means of promoting the Government’s asserted interest (here, recruiting talented lawyers). See infra Parts III.B.l(c), 2(e). Needless to say, this is an imposing barrier.
The District Court, by contrast, emphasized a third potential theory of this case that invokes only intermediate scrutiny, ie., whether the government action at issue furthers an important government interest that would be achieved less effectively without that action. The Court asked whether the law schools’ resistance to the Solomon Amendment is sufficiently communicative to bring it within the ambit of the First Amendment’s protection for “expressive conduct,” the suppression of which receives intermediate scrutiny under United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See infra Part III.B.3(b). We emphasize at the outset that we need not decide this issue because we conclude that the Solomon Amendment violates the First Amendment by impeding the law schools’ rights of expressive association and by compelling them to assist in the expressive act of recruiting. Nonetheless, we explain briefly our conclusion that FAIR would prevail even under O’Brien’s less strict framework.
1. Expressive Association
FAIR argues that the Solomon Amendment impairs law schools’ First Amendment rights under the doctrine of expressive association. The Supreme Court most recently addressed this doctrine in Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). There the Court held that a state public accommodations law that prohibited discrimination based on sexual orientation could not constitutionally be invoked to force the Boy Scouts to accept openly gay James Dale as an assistant scoutmaster. Id. at 659, 120 S.Ct. 2446. Central to its analysis was the deference it gave to the Boy Scouts’ “view of what would impair its *231 expression,” which compelled the Court’s conclusion that Dale’s presence would “significantly burden the Boy Scouts’ desire to not ‘promote homosexual conduct as a legitimate form of behavior.’ ” Id. at 653, 120 S.Ct. 2446 (citation omitted).
Under Dale, the elements of an expressive association claim are (1) whether the group is an “expressive association,” (2) whether the state action at issue significantly affects the group’s ability to advocate its viewpoint, and (3) whether the state’s interest justifies the burden it imposes on the group’s expressive association. Id. at 648-58, 120 S.Ct. 2446; accord The Circle School v. Pappert, 381 F.3d 172, 181-82 (3d Cir.2004) (applying the Dale framework); Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 442 (3d Cir.2000) (same). We apply each in turn to analyze FAIR’S expressive association claim.
(a) The law schools are expressive associations.
A group that engages in some form of public or private expression above a de minimis threshold is an “expressive association.” Pi Lambda Phi, 229 F.3d at 443. The group need not be an advocacy group or exist primarily for the purpose of expression. Dale, 530 U.S. at 648, 120 S.Ct. 2446. The Supreme Court held that the Boy Scouts, which “seeks to transmit ... a system of values, engages in expressive activity.” Id. at 650, 120 S.Ct. 2446.
“By nature, educational institutions are highly expressive organizations, as their philosophy and values are directly inculcated in their students.” The Circle School, 381 F.3d at 182. Because FAIR has shown that the law schools “possess[ ] clear educational philosophies, missions and goals,” id., we agree with the District Court’s conclusion that they qualify as expressive associations. FAIR, 291 F.Supp.2d at 303-04. Therefore, FAIR satisfies the first element of the Dale analysis.
(b) The Solomon Amendment significantly affects the law schools’ ability to express their viewpoint.
FAIR argues that the Solomon Amendment significantly affects law schools’ ability to express their viewpoint, reflected in their policies, that discrimination on the basis of sexual orientation is wrong. The Solomon Amendment compels them, they contend, to disseminate the opposite message. The schools believe that, by coordinating interviews and posting and publishing recruiting notices of an employer who discriminates on the basis of sexual orientation, they impair their ability to teach an inclusive message by example. Put another way, FAIR maintains that the Solomon Amendment suppresses the law schools’ chosen speech by interfering with their prerogative to shape the way they educate (including, of course, the manner in which they communicate their message).
In Dale, the Supreme Court recognized that “[t]he forced inclusion of an unwanted person in a group” could significantly affect the group’s ability to advocate its public or private viewpoint. 530 U.S. at 648, 120 S.Ct. 2446. The viewpoint at issue in Dale was the Boy Scouts’ long-held belief that “homosexual conduct is inconsistent with ... the Scout Oath” and that “homosexuals [do not] provide a role model consistent with the[ ] expectations [of Scouting families].” Id. at 652, 120 S.Ct. 2446. Because the Boy Scouts’ expressive purpose was to “inculcate [youth] with the Boy Scouts’ values-both expressively and by example,” id. at 649-50, 120 S.Ct. 2446, the organization believed that the presence of an openly gay assistant scoutmaster could be perceived as “promoting] homosexual conduct as a legitimate form of behavior,” *232 a message inconsistent with the expression it wished to convey and the example it wished to set. Id. at 651, 120 S.Ct. 2446.
The Supreme Court agreed. Because James Dale was openly gay, his “presence in the Boy Scouts would, at the very least, force the organization to send a message, both to youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior.” Id. at 653, 120 S.Ct. 2446.
Just as the Boy Scouts believed that “homosexual conduct is inconsistent with the Scout Oath,” id. at 652, 120 S.Ct. 2446, the law schools believe that employment discrimination is inconsistent with their commitment to justice and fairness. Just as the Boy Scouts maintained that “homosexuals do not provide a role model consistent with the expectations of Scouting families,” id., the law schools maintain that military recruiters engaging in exclusionary hiring “do not provide a role model consistent with the expectations of,” id., their students and the legal community. Just as the Boy Scouts endeavored to “inculcate [youth] with the Boy Scouts’ values-both expressively and by example,” id. at 649-50, 120 S.Ct. 2446, the law schools endeavor to “inculcate” their students with their chosen values by expression and example in the promulgation and enforcement of their nondiscrimination policies. FAIR Br. at 22-25. And just as “Dale’s presence in the Boy Scouts would, at the very least, force the organization to send a message, both to youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior,” Dale, 530 U.S. at 653, 120 S.Ct. 2446, the presence of military recruiters “would, at the very least, force the law schools to send a message,” both to students and the legal community, that the law schools “accept” employment discrimination “as a legitimate form of behavior.” Id.
Notwithstanding this compelling analogy, the District Court distinguished our case from Dale by suggesting there was a critical difference between the forced inclusion of a gay assistant scoutmaster and the forced presence of an “unwanted periodic visitor,” the military recruiter, in the context of a larger recruiting effort. FAIR, 291 F.Supp.2d at 304, 305. While there was “no question” that the gay scoutmaster would “undermine the Boy Scouts’ ability to ... inculcate its values in younger members,” the District Court wrote, the Solomon Amendment does not compel the law schools to accept the military recruiters as a “member” and does not “bestow upon them any semblance of authority.” Id. at 305.
But our Court has recently held that compulsory accommodation of a government-prescribed message may violate schools’ First Amendment expressive association rights, even when that message involves our most revered affirmations of American patriotism-the Pledge of Allegiance and our National Anthem, is only minimally intrusive and lacks the schools’ imprimatur. The Circle School, 381 F.3d at 182 (holding that a statute requiring private schools to lead the Pledge of Allegiance and National Anthem violates their rights under the expressive association doctrine-“Certainly, the temporal duration of a burden on First Amendment rights is not determinative of whether there is a constitutional violation.... Similarly, the fact that the schools can issue a general disclaimer does not erase the First Amendment infringement at issue here, for the schools are still compelled to speak the [Government’s] message.”). If the Pledge and Anthem “only take[] a very short period of time each day,” and may be preceded by “a general disclaimer regard *233 ing the recitation,” yet do not “erase the First Amendment infringement at issue here,” id., then focusing on the periodic nature of the military recruiter’s visits[11] is similarly unavailing.
Moreover, the District Court’s scrutiny of the law schools’ belief that the presence of military recruiters will undermine their expressive message about fairness and social justice violates the Dale Court’s instruction to “give deference to an association’s view of what would impair its expression.” 530 U.S. at 653, 120 S.Ct. 2446.[12] In Dale, the Court did more than pay lip service to deference notions. Deference distinguished the Supreme Court’s conclusion on the impairment question from that of the New Jersey Supreme Court, which had decided the case previously. The state court had ruled in Dale’s favor, holding that because the Boy Scouts have a policy of “discourag[ing] its leaders from disseminating any views on sexual issues,” Dale’s presence would not significantly affect its ability to disseminate its message. 530 U.S. at 654, 120 S.Ct. 2446 (citing Dale v. Boy Scouts of America, 160 N.J. 562, 734 A.2d 1196, 1223 (1999) (emphasis in original)). But faced with competing views-the Boy Scouts’ view that Dale’s presence impaired their message and the state court’s view that it could not-the Supreme Court deferred to the Boy Scouts’ view. In other words, the reason why there was “no question” (in the District Court’s words in our case, 291 F.Supp.2d at 305) that a gay scoutmaster would undermine the Boy Scouts’ message was because the Boy Scouts said it would. Dale, 530 U.S. at 653, 120 S.Ct. 2446. In our case, FAIR has supplied written evidence of its belief that the Solomon Amendment’s forcible inclusion of and assistance to military recruiters undermines their efforts to disseminate their chosen message of nondiscrimination. Accordingly, we must give Dale deference to this belief,[13] and con- *234 elude that FAIR likely satisfies the second element of an expressive association claim.
(c) Balancing of interests
The third step in evaluating an expressive association claim is “balancing the First Amendment interests implicated by the Solomon Amendment with competing societal interests to determine whether the statute transgresses constitutional boundaries.” FAIR, 291 F.Supp.2d at 310.[14] We need not linger on this analysis. Rarely has government action been deemed so integral to the advancement of a compelling purpose as to justify the suppression or compulsion of speech. We presume that the Government has a compelling interest in attracting talented military lawyers.[15] But “[i]t is not enough to show that the Government’s ends are compelling; the means must be carefully tailored to achieve those ends.” Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).
As we explain in the final section of our opinion, infra Part III.B.3(b), the Solomon Amendment could barely be tailored more broadly. Unlike a typical employer, the *235 military has ample resources to recruit through alternative means. For example, it may generate student interest by means of loan repayment programs. And it may use sophisticated recruitment devices that are generally too expensive for use by civilian recruiters, such as television and radio advertisements. These methods do not require the assistance of law school space or personnel. And while they may be more costly, the Government has given us no reason to suspect that they are less effective than on-campus recruiting.
The availability of alternative, less speech-restrictive means of effective recruitment is sufficient to render the Solomon Amendment unconstitutional under strict scrutiny analysis. Sable, 492 U.S. at 126, 109 S.Ct. 2829; The Circle School, 381 F.3d at 182. But our path in this case is even clearer. The Government has failed to proffer a shred of evidence that the Solomon Amendment materially enhances its stated goal. And not only might other methods of recruitment yield acceptable results, they might actually fare better than the current system. In fact, it may plausibly be the case that the Solomon Amendment, which has generated much ill will toward the military on law school campuses,[16] actually impedes recruitment.[17]
FAIR likely satisfies the three elements of an expressive association claim. The law schools are expressive associations, they believe the message they choose to express is impaired by the Solomon Amendment, and no compelling governmental interest exists in the record to justify this impairment. Therefore, FAIR has a reasonable likelihood of success on the merits of its expressive association claim against the Solomon Amendment.
2. Compelled Speech
The Supreme Court has long recognized that, in addition to restricting suppression of speech, “the First Amendment may prevent the government from ... compelling individuals to express certain views.” United States v. United Foods, Inc., 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (citing, inter alia, W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). “At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.” Turner Broad. Sys, Inc. v. FCC, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).
Consistent with this principle, the Supreme Court has found impermissible compelled speech in three categories of gov *236 ernment action. The first is government action that forces a private speaker to propagate a particular message chosen by a government. See Barnette, 319 U.S. at 642, 63 S.Ct. 1178 (state could not enforce compulsory flag salute statute); Wooley v. Maynard, 430 U.S. 705, 717, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state could not require drivers to display state motto on their license plates). The second is government action that forces a private speaker to accommodate or include another private speaker’s message. See Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston, 515 U.S. 557, 581, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (state nondiscrimination statute could not be constitutionally applied to require parade organizers to include a contingent of gay marchers behind their own banner); Pacific Gas & Elec. Co. v. Pub. Utils. Comm’n, 475 U.S. 1, 12-16, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (state regulatory commission could not require public utility to distribute ratepayer-group’s message in the extra space of the utility’s billing statements); Miami Herald Publ’g Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (state could not force newspaper to provide equal editorial-page space to candidates it opposes). The third category is government action that forces an individual to subsidize or contribute to an organization that engages in speech that the individual opposes. See United Foods, 533 U.S. at 413, 121 S.Ct. 2334 (Congress could not require mushroom growers to pay assessments to fund advertisements to promote mushroom sales); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 235, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (state could not compel non-union employees to pay union dues to promote union causes).[18] FAIR argues that the Solomon Amendment forces law schools to propagate, accommodate, and subsidize the military’s recruiting, and therefore implicates each of the three varieties of compelled speech cases.
The District Court rejected FAIR’S argument and held that the law schools are not compelled to express a particular ideological message by admitting and actively assisting the military recruiters. We disagree. As we explain in the analysis that follows, the military’s recruiting is expressive of a message with which the law schools disagree. To comply with the Solomon Amendment, the law schools must affirmatively assist military recruiters in the same manner they assist other recruiters, which means they must propagate, accommodate, and subsidize the military’s message. In so doing, the Solomon Amendment conditions funding on a basis that violates the law schools’ First Amendment rights under the compelled speech doctrine.
(a) Recruiting is expression.
The expressive nature of recruiting is evident by the oral and written communication that recruiting entails: published and posted announcements of the recruiter’s visit, published and oral descriptions of the employer and the jobs it is trying to fill,[19] and the oral commu *237 nication of an employer’s recruiting reception and one-on-one interviews. The expressive nature of recruiting is also evident in its purpose-to convince prospective employees that an employer is worth working for. So understood, recruiting necessarily involves “communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes”-the hallmarks of First Amendment expression. Village of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (soliciting for charitable cause is expression entitled to First Amendment protection); see also Thomas v. Collins, 323 U.S. 516, 538, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (recognizing First Amendment protection for the solicitation of union members).
The District Court held that recruiting is not expressive activity because it “differs dramatically” from other forms of expressive activity, such as soliciting contributions and proselytizing. While soliciting and proselytizing cannot be separated from the “concomitant advocacy of a particular case or viewpoint,” the District Court reasoned, recruiting does not advocate any particular cause but only has “an economic or functional motive.” FAIR, 291 F.Supp.2d at 307-08.
We agree with the District Court that soliciting and proselytizing are obvious forms of expressive activity. We part, however, on the notion that efforts to raise a legal staff are “economic or functional” while efforts to raise funds and membership are not. Recruiting, soliciting and proselytizing are similarly economic and functional and, at-the same time, similarly expressive. Recruiting conveys the message that “our organization is worth working for,” while soliciting and proselytizing convey the similar functional message that
“our .charity is worth giving to” or “our cause is worth joining.”
Having determined that recruiting is expressive, we now turn to the law schools’ disagreement with that expression.
(b) The law schools’ disagreement with the speech of military recruiters.
Military recruiters visiting law school campuses undoubtedly speak to students about the benefits of a career in 'the military, and the Solomon Amendment requires law schools to accept this speech. The law schools do not seem to take issue with most of. the “expressions of value, opinion, or endorsement,” Hurley, 515 U.S. at 573, 115 S.Ct. 2338, made by military recruiters on campus (to the extent recruiters suggest that military careers are honorable and rewarding experiences). Nor, for the most part, do military recruiters describing careers in the military make “statements of fact the [law schools] would rather avoid.” Id.
The law schools’ lack of objection to most of.: the speech they are forced to accept within their fora raises a key question under the compelled speech doctrine: to what extent must they disagree with the Government’s message in order for strict scrutiny to apply? Justice Souter’s dissent in Glickman v.' Wileman Bros. & Elliott, Inc., 521 U.S.- 457, 117 S.Ct. 2130,-138 L.Ed.2d 585 (1997), summarized the Court’s jurisprudence to that time in suggesting that it is not necessary to show disagreement in order- to sustain a compelled'speech challenge.
[T]he requirement of disagreement finds no legal warrant in our eompelled-speech cases. In Riley [v. Fed’n of the Blind of North Carolina, Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ], for example, we held that the free-speech rights of charitable solicitors were infringed by a law compelling *238 statements of fact with which the objectors could not, and did not profess to, disagree. See 487 U.S., at 797-98, 108 S.Ct., at 2677-2678. See also Hurley, 515 U.S., at 573, 115 S.Ct., at 2347 (“[The] general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid ... [.]”); Barnette, 319 U.S., at 635, 63 S.Ct., at 1183-1184 (if the Free Speech Clause bars the government from making the flag salute a legal duty, nonconformist beliefs are not required to exempt one from saluting). Indeed, the Abood cases themselves protect objecting employees from being forced to subsidize ideological union activities unrelated to collective bargaining, without any requirement that the objectors declare that they disagree with the positions espoused by the union. See, e.g., [Chicago Teachers Union v. Hudson, 475 U.S. 292, 301-02, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986)]; Abood, 431 U.S., at 234, 97 S.Ct., at 1799. Requiring a profession of disagreement is likewise at odds with our holding two Terms ago that no articulable message is necessary for expression to be protected, Hurley, supra, at 569, 115 S.Ct., at 2345; protection of speech is not limited to clear-cut propositions subject to assent or contradiction, but covers a broader sphere of expressive preference.... One need not “disagree” with an abstractionist when buying a canvas from a representational painter; one merely wishes to support a different act of expression.
Glickman, 521 U.S. at 488-89, 117 S.Ct. 2130 (Souter, J., dissenting, joined by Rehnquist, C.J., Scalia, J., and Thomas, J.).
Despite the numerous precedents to the contrary discussed by Justice Souter, it is possible to read the Glickman majority as implicitly endorsing a disagreement requirement in the compelled speech context. Glickman involved a First Amendment challenge to regulations x-equiring fruit growers, handlers, and processors to finance generic advertising of California nectarines, plums, and peaches. Id. at 460, 117 S.Ct. 2130. The majority “pre-sumefd]” that the fruit growers, handlers, and processors “agree[d] with the central message of the speech that is generated by the generic [government] program [at issue],” and stated that “compelled speech case law” was “inapplicable” because the scheme at issue did not, inter alia, “require them to use their own property to convey an antagonistic ideological message,” or “force them to respond to a hostile message when they would prefer to remain silent,” id. at 470-71, 117 S.Ct. 2130 (citations and internal quotation marks omitted) (emphases added). However, because the degree of disagreement that may be required is minimal and in any event is present in this case, we need not determine whether such a requirement exists nor, if so, decipher its precise bounds.
As our dissenting colleague recently explained, the “individual’s disagreement [in a compelled speech case] can be minor, as ‘[t]he general rule is that the speaker and the audience, not the government, assess the value of the information presented.’ ” Cochran v. Veneman, 359 F.3d 263, 275 (3d Cir.2004) (quoting United Foods, 533 U.S. at 411, 121 S.Ct. 2334). In Cochran, we held unconstitutional a law requiring dairy producers to pay small assessments in support of “generic advertising that promotes milk.” Id. Although the aggrieved dairy producers did not disapprove of the pro-milk message at issue, the ads featured milk “produced by methods they view[ed] as wasteful and harmful to the environment,” and did not promote milk *239 produced by their own favored methods. Id. The ads, in effect, served to promote milk produced by efforts with which the plaintiff dairy producers disagreed.
Here the law schools similarly object to conveying the message that all employers are equal, and instead would rather only open their fora and use their resources to support employers who, in their eyes, do not discriminate against gays. This objection constitutes as much of a protected First Amendment interest as the objection of the dairy farmers in Cochran. Moreover, there is at least one important sense in which the law schools strenuously disagree with the very words spoken by military recruiters that the Solomon Amendment compels them to accept and to which they have been forced to respond. 10 U.S.C. § 654(b) prohibits open, practicing gays from serving in the armed forces. Military recruiters undisputedly are bound by § 654(b), and do not recruit gay persons for service. Unsurprisingly, in light of § 654(b), the record demonstrates that openly gay persons who meet with military recruiters are told by the recruiters that they may not pursue military careers.[20] Such speech by military recruiters is perhaps the most discordant speech the Solomon Amendment compels the law schools to accept. Yet, as we have indicated, the act of being forced to accept speech promoting an employer whose discriminatory policies the law schools disagree with is sufficient “disagreement” to bring the Solomon Amendment within the Supreme Court’s compelled speech jurisprudence.
Thus, unlike the regulatory scheme at issue in Glickman, the Solomon Amendment, by requiring law schools to open their fora to military recruiters when they would prefer to do so only for non-discrim-mating employers, “require[s] them to use their own property to convey an antagonistic ideological message.” Glickman, 521 U.S. at 471, 117 S.Ct. 2130. Likewise, by directly providing “access” to campuses for speech by military recruiters where law students are told that openly gay applicants may not serve, the Solomon Amendment requires the law schools to allow an objectionable message counter to their beliefs. In addition, both forms of speech with which the law schools disagree have resulted in, according to the record, hundreds (if not thousands) of instances of responsive speech by members of the law school communities (administrators, faculty, and students), including various broadcast e-mails by law school administrators to their communities, posters in protest of military recruiter visits, and open fora held to “ameliorate” the effects of forced on-campus speech by military recruiters. All of these represent instances in which the schools were “force[d] ... to respond to a hostile message when they would prefer to remain silent.” Id. (internal quotation marks omitted). Therefore, the degree of the law schools’ disagreement with the military recruiters’ expression is sufficient to warrant First Amendment protection. We now determine whether the Solomon Amendment compels the law schools to engage in that expression.
(c) The laio schools must propagate, accommodate, and subsidize the military’s expressive message.
Reasoning that the Solomon Amendment was not “an outright regulation on speech,” the District Court held that the Supreme Court’s compelled speech doctrine did not apply. FAIR, 291 F.Supp.2d at 309. Put another way, the District *240 Court concluded that the statute does not “directly requir[e] a private speaker to participate in the dissemination of a particular message.” Id.
We disagree. Having concluded above that recruiting is expression, we believe that the Solomon Amendment compels the law schools to engage in that expression in all three proscribed ways: propagation, accommodation, and subsidy. The statute insists not only on access to campus for military recruiters, but the active and equal assistance of law schools’ career services offices. For example, Harvard Law School’s career services staff offers to assist employers to “get [their] message out to students in an effective manner.” Like many law schools, the assistance Harvard provides includes coordinating interviews with students, counseling employers on effective recruiting, stuffing students’ mailboxes with employers’ information, scheduling social receptions for students, and printing employers’ announcements in the School’s newsletter. Under the express terms of the Solomon Amendment, law schools like Harvard must do the same for the military recruiters.
By requiring law schools to help military recruiters “get [their] message out to students” by distributing newsletters and posting notices, the Solomon Amendment compels law schools to propagate the military’s message. Like the forced display of an unwanted motto on one’s license plate, or the compulsory recitation of a pledge, this is compelled speech. Wooley, 430 U.S. at 717, 97 S.Ct. 1428; Barnette, 319 U.S. at 642, 63 S.Ct. 1178. By requiring schools to include military recruiters in the interviews and recruiting receptions the schools arrange, the Solomon Amendment compels the schools to accommodate the military’s message in the recruiting-assistance programs they provide for other employers. Like the forced inclusion of a parade contingent, a statement in the extra space of a utility’s billing statement, or a response in a newspaper’s editorial page, this is compelled speech. See Hurley, 515 U.S. at 569-81, 115 S.Ct. 2338; Pacific Gas, 475 U.S. at 12-16, 106 S.Ct. 903; Miami Herald, 418 U.S. at 255-58, 94 S.Ct. 2831. And by putting demands on the law schools’ employees and resources,[21] the schools are compelled to subsidize the military’s recruiting message. Like mandatory assessments to support advertisements or political funds, this is compelled speech. See United Foods, 533 U.S. at 411-17, 121 S.Ct. 2334; Abood, 431 U.S. at 235, 97 S.Ct. 1782.
(d) The Solomon Amendment prohibits disclaimers and, even if it did not, risk of misattribution is not an element of a compelled speech violation.
The District Court suggested that assisting military recruiters is not “obvious endorsement” by the law schools of the military’s point of view because “law schools can effectively disclaim any recruiting message and can easily distance themselves ideologically from the military recruiters.” FAIR, 291 F.Supp.2d at 308, 310. But the Solomon Amendment, as recently amended, does not appear to permit law schools to disclaim the military’s message. Its express terms require them to provide treatment to the military recruiters “equal in quality and scope” to that provided to other employers. As the law schools do not disclaim the messages of those employers, similarly they may not *241 disclaim the message of the military. Furthermore, it was in apparent response to the law schools’ ameliorative measures-their efforts to “distance themselves” (in the District Court’s words) from the military’s position-that the DOD and eventually Congress insisted on equal treatment for military recruiters.
But even if the Solomon Amendment allowed for disclaimers, the Supreme Court has never held that compelled speech concerns evaporate if a speaker can ameliorate the risk of misattribution by disclaiming the message it is being compelled to propagate. To the contrary, “the presence of a disclaimer ... does not suffice to eliminate the impermissible pressure ... to respond to [compelled] speech.” Pacific Gas, 475 U.S. at 15 n. 11, 106 S.Ct. 903 (plurality opinion). While a disclaimer reduces the risk that readers will misattribute the message, it “does nothing to reduce the risk that [the compelled speaker] will be forced to respond when there is strong disagreement with the substance of [the] message.” Id. Thus, in Pacific Gas, the Supreme Court invalidated as compelled speech a requirement that a utility share the extra space in its billing statements with an organization that opposed its viewpoint. The utility’s ability to include a disclaimer did not change the analysis. In fact, a “forced reply” may add to the injury of compelled speech, not its cure. Id. at 15-16, 106 S.Ct. 903 (noting that the “pressure to respond” to compelled speech is “antithetical to the free discussion that the First Amendment seeks to foster”).
In Miami Herald, the Supreme Court also invalidated a state law compelling newspapers to provide editorial page space to any political candidates that the newspaper assailed in an editorial. 418 U.S. at 255-58, 94 S.Ct. 2831. It did not suggest that a newspaper could alleviate compelled speech by running a disclaimer above the candidate’s message.[22]
Similarly, in Wooley the Court held that the state motto on the Maynards’ license plate was compelled speech even though the state supreme court had expressly found in another case that “nothing in the state law ... precludes appellees from displaying their disagreement with the state motto as long as the methods used do not obscure the license plates.” 430 U.S. at 722, 97 S.Ct. 1428 (Rehnquist, J., dissenting) (citing State v. Hoskin, 112 N.H. 332, 295 A.2d 454 (1972)).[23] On the facts of Wooley, there was virtually no risk that the compelled speech would be attributed to anyone other than the state.
*242 In sum, law schools are expressly precluded from disclaiming or retorting the military’s recruiting message by the Solomon Amendment’s new requirement that their treatment of military recruiters be “equal in quality and scope” to the treatment of other recruiters. And while the Court has mentioned the danger of misat-tribution and the speaker’s ability to disclaim in several of its compelled speech cases, it has not held to date that the presence of either factor eliminated compelled speech concerns. Therefore, the District Court was wrong to reject FAIR’S compelled speech claims on the basis of its conclusion that the Solomon Amendment’s requirements posed little risk of misattri-bution to the law schools who in any event could effectively disclaim the military’s message.
(e) The Solomon Amendment would not likely survive strict scrutiny.
Although the Solomon Amendment impairs the law schools’ First Amendment rights by compelling them to propagate, accommodate, and subsidize the military’s recruiting message against their will, the statute “could still be valid if it were a narrowly tailored means of serving a compelling state interest”-! e., if it passed strict First Amendment scrutiny. Pacific Gas, 475 U.S. at 19, 106 S.Ct. 903; see also Riley, 487 U.S. at 798, 108 S.Ct. 2667 (regulation impairing speakers’ First Amendment rights under the compelled speech doctrine was subject to “exacting First Amendment scrutiny” that it did not survive). We thus inquire (1) whether the Government’s interest in recruiting military lawyers is compelling, and (2) whether the Solomon Amendment is narrowly tailored to advance that goal. But as discussed above in the context of FAIR’S expressive association claim, see supra Part III.B.l(c), the Solomon Amendment does not survive strict scrutiny because the Government has not demonstrated (or even argued) that it cannot recruit effectively by less speech-restrictive means. Therefore, the balance of interests likely tips in the law schools’ favor.
*243 To summarize, the Solomon Amendment conditions funding on the law schools’ propagation, accommodation, and subsidy of the military’s recruiting, which is expression. The Government has not shown that the assistance from law schools that the Solomon Amendment requires is narrowly tailored to advance its interest in recruiting. FAIR has thus established a reasonable likelihood of establishing that the Solomon Amendment unconstitutionally conditions funding on a basis that infringes law schools’ constitutionally protected interests under the First Amendment doctrine of compelled speech.
3. Consideration of O’Brien
We turn finally to an argument that is ancillary to our holding. Although the Solomon Amendment fits within the categories of First Amendment eases described in the previous sections, the District Court placed it instead into a mold it does not fit: the doctrine of expressive conduct. In so doing, it applied the intermediate scrutiny test set out by the Supreme Court in United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), discussed at length below, for review of governmental regulations with only an incidental effect on expression. For the sake of completeness, we close by considering whether the law schools’ resistance to the military’s recruitment policy, motivated by their ideological opposition to exclusion based on sexual orientation, is expressive conduct protected by the First Amendment.[24]
(a) O’Brien is inapplicable when First Amendment activity is protected on other grounds.
Before exploring the contours of the O’Brien test, we explain briefly why expressive conduct fails as a descriptive model of the First Amendment issues at stake in this case. Activity simultaneously may give rise to an expressive conduct claim and to claims based on alternative theories. The premise of the category “expressive conduct” is that some activity, though it is not speech proper and is not protected under other First Amendment grounds, is crucial to public debate and warrants protection. See Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (explaining that the Court has “long recognized that [the First Amendment’s] protection does not end at the spoken or written word” and that conduct may be “sufficiently imbued with elements of communication” to merit First Amendment protection) (citations omitted). Expressive conduct is, loosely stated, an overflow category; it is broad.[25] It is *244 therefore unsurprising that much expression that falls squarely within the doctrines discussed in the first sections may also be cast as expressive conduct. In those cases, application of the O’Brien test is inappropriate.
We need only look at the seminal expressive association and compelled speech cases to see that this is so. In Dale, for example, the Supreme Court expressly declined to rely on O’Brien, explaining: “New Jersey’s public accommodations law directly and immediately affects associational rights, in this case associational rights that enjoy First Amendment protection. Thus, O’Brien is inapplicable.” 530 U.S. at 659, 120 S.Ct. 2446. Likewise in Wooley v. Maynard, the Supreme Court elected not to consider O’Brien because it considered compelled speech to be a “more appropriate First Amendment ground[].” 430 U.S. at 713, 97 S.Ct. 1428. In short, the Court has not applied O’Brien where alternative First Amendment grounds were available.
Taking our cue from the Supreme Court, because the Solomon Amendment is subject to strict scrutiny under the doctrines of expressive association and compelled speech, we need not engage in an O’Brien analysis. Because O’Brien scrutiny is intermediate rather than strict, demonstrating a constitutional violation under a theory of expressive conduct is significantly more burdensome than under the models we have discussed. And the law schools need establish only one constitutional infirmity to justify an injunction. See, e.g., Sys. Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1144 (3d Cir.1977).
(b) Even under O’Brien, the Solomon Amendment is likely to impair expressive conduct unconstitutionally.
Even if O’Brien applied, we would reverse the District Court’s decision because we disagree with its application of intermediate scrutiny. Notwithstanding that the District Court’s opinion featured a consistent theme-that the Solomon Amendment “targets conduct, not speech”-the Court acknowledged a communicative or expressive element in the law schools’ policies against offering the schools’ resources, support, or endorsement to any employer who does not conform to their antidiscrimination policies. FAIR, 291 F.Supp.2d at 311. Thus, to the extent we focus on the law schools’ conduct, it is nonetheless expressive.
The First Amendment protects the right to engage in expressive conduct. See, e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (recognizing the right of boycotters to “band[ ] together and collectively express[ ] their dissatisfaction with a social structure that had denied them rights to equal treatment and respect”); Spence v. Washington, 418 U.S. 405, 411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (acknowledging First Amendment protection for conduct that “convey[s] a particularized message” that is understood as expression in the context of surrounding circumstances). A government regulation impairing expressive conduct is only justified “[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms *245 is no greater than is essential to the furtherance of that interest.” O’Brien, 391 U.S. at 377, 88 S.Ct. 1673.
We take no issue with the District Court’s conclusion that the Solomon Amendment is within the constitutional power of the Government, as the Constitution authorizes Congress to raise and support a military. FAIR, 291 F.Supp.2d at 312 (citing U.S. Const. art. 1 § 8). We assume arguendo that the District Court was correct in determining that the Solomon Amendment is unrelated to the suppression of ideas. Id. at 314. And we of course presume that the United States has a vital interest in having a system for acquiring talented military lawyers. But as we noted above, the Government has chosen to submit no evidence that would support the necessity of requiring law schools to provide the military with a forum for, and assistance in, recruiting. Instead, the Government argues that “the impact of the wholesale exclusion of military recruiters [from law school campuses] is self-evident, and the government is not obligated” during preliminary injunction proceedings “to assemble and present a factual record that merely confirms the dictates of common sense.” The Government fails to offer even an affidavit indicating that enforcement of the Solomon Amendment has enhanced military recruiting efforts. It suggests simply that the scope of the remedy sought by the plaintiffs relieves the Government of its obligation, pursuant to the First Amendment, to justify its curtailment of expression. How this is so we cannot conjure. We are unaware of any case so holding.[26] And while the Government emphasizes that the Nation’s military is at stake, invoking the importance of a well-trained military is not a substitute for demonstrating that there is an important governmental interest in opening the law schools to military recruiting. See Rostker v. Goldberg, 453 U.S. 57, 89, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (“ ‘[T]he phrase “war power” cannot be invoked as a talismanic incantation to ... remove constitutional limitations safeguarding essential liberties.’ ” (quoting United States v. Robel, 389 U.S. 258, 263-64, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967))).[27]
It may be the case, as the Government argues, that on-campus recruitment is an employer’s principal tool for attracting talented students. But it does not thereby follow that recruiting by means of the Solomon Amendment is effective. On the contrary, it seems to us equally plausible that the Solomon Amendment has in fact hampered recruitment by subjecting the military’s exclusionary policy to public scrutiny. The record is replete with references to student protests and public condemnation. In this context, it is hardly “common sense,” as the military alleges, that its presence on campus amidst such commotion and opposition has aided its recruitment efforts.
*246 In closing, we emphasize again that we need not enter the thicket of O’Brien analysis in this case. We rely on the doctrines of expressive association and compelled speech to conclude that FAIR has made the requisite showing of a likelihood of success on the merits in support of its motion for a preliminary injunction. And even under the intermediate scrutiny test of O’Brien the Solomon Amendment falters thus far, for the Government has chosen not to produce any evidence that it is no more than necessary to further the Government’s interest. Perhaps this explains why the DOD initially objected to the Amendment as “unnecessary” and “du-plicative.” 140 Cong. Rec. H3864 (daily ed. May 23,1994).
C. Other preliminary injunction factors
By establishing a likelihood of success on the merits of its unconstitutional condition claim based on a First Amendment violation, FAIR has necessarily satisfied the second element: irreparable harm. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (“The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.”); see also Beal v. Stern, 184 F.3d 117, 123 (2d Cir.1999) (“[T]he irreparable injury issue and the likelihood of success issue overlap almost entirely” in the First Amendment context). On the third element, we conclude that the balance of interest tips in FAIR’S favor. Without an injunction, the law schools’ First Amendment rights under the expressive association doctrine and the compelled speech doctrine will be impaired during on-campus recruiting seasons. The Government, on the other hand, does not lose the opportunity, in a proceeding on the merits, to “shoulder its full constitutional burden of proof’ of showing that a less restrictive alternative would not be as effective. Ashcroft v. ACLU, — U.S. -, 124 S.Ct. 2783, 2794, 159 L.Ed.2d 690 (2004). As for the final element, we believe the public is best served by enjoining a statute that unconstitutionally impairs First Amendment rights.
IV. Conclusion
The Solomon Amendment requires law schools to express a message that is incompatible with their educational objectives, and no compelling governmental interest has been shown to deny this freedom. While no doubt military lawyers are critical to the efficient operation of the armed forces, mere incantation of the need for legal talent cannot override a clear First Amendment impairment. Even were the test less rigorous than a compelling governmental riposte to the schools’ rights under the First Amendment, failure nonetheless is foreordained at this stage, for the military fails to provide any evidence that its restrictions on speech are no more than required to further its interest in attracting good legal counsel.
In this context, the Solomon Amendment cannot condition federal funding on law schools’ compliance with it. FAIR has a reasonable likelihood of success on the merits and satisfies the other injunctive elements as well. We reverse and remand for the District Court to enter a preliminary injunction against enforcement of the Solomon Amendment.

. Joining FAIR in its preliminary injunction motion and in this appeal are: the Society for Law Teachers, Inc.; the Coalition for Equality; Rutgers Gay and Lesbian Caucus; law professors Erwin Chemerinsky and Sylvia Law; and law students Pam Nickisher, Leslie Fischer, Ph.D., and Michael Blauschild. For convenience, we refer to all plaintiff-appellants collectively as "FAIR.”

. The facts on appeal are not in dispute. As the District Court noted, the Government did not challenge or supplement the factual assertions presented by FAIR in its motion for injunctive relief. FAIR, 291 F.Supp.2d at 277.

. While the current statutory version of the military's exclusionary policy has existed since 1993, National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103-160, § 571(a)(1), 107 Stat. 1547, 1670 (Nov. 30, 1993), the military has had formal regulatory policies excluding gays and lesbians since World War I and a practice of such exclusion since the Revolutionary War. See, e.g., Articles of War of 1916, Pub.L. No. 242, art. 93, 39 Stat. 619, 664 (assault with intent to commit sodomy punishable by court martial); see generally Randy Shilts, Conduct Unbecoming: Gays & Lesbians in the U.S. Military 11-17 (1994).
Under the current statute, a servicemember is separated from the military if it is found that he or she “engaged in ... a homosexual act” or "stated that he or she is a homosexual” or "married or attempted to marry a person known to be of the same biological sex.” 10 U.S.C. § 654(b). It defines "homosexual” and "homosexual act” to include evidence demonstrating "a propensity or intent to engage in homosexual acts.” Id. It also allows servicemembers to rebut findings of proscribed conduct with evidence of the lack of a propensity to engage in homosexual conduct, i.e., evidence of a heterosexual orientation. Id. Law schools interpret the ban as conflicting with their policies against discrimination on the basis of sexual orientation.

. Department of Homeland Security funds later replaced Department of Transportation funds. Pub.L. No. 107-296, § 1704(b)(1), 116 Stat. 2314 (2002).

. A separate amendment cancelled the application of the Solomon Amendment to direct student aid. Department of Defense Appropriations Act of 2000, § 8120, Pub.L. No. 106-79, 113 Stat. 1212, 1260 (1999).

. In wording the new informal policy's substantive requirement, the DOD borrowed language from the existing policy's regulatory exception-32 C.F.R. 216.4(c) (exempting from Solomon Act compliance a law school that “presents evidence that the degree of access by military recruiters is at least equal in quality and scope to that afforded to other employers”).

. Standing must also be proper for subject matter jurisdiction to exist. See, e.g., Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir.2003); 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531 (2d ed.1984). The District Court held that FAIR had standing to seek a preliminary injunction against the Solomon Amendment, and the Government has conceded this issue on appeal. Acknowledging our continuing obligation to verify subject matter jurisdiction when it is in question, see, e.g., Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 364 F.3d 102, 104 (3d Cir.), cert. granted on other grounds, - U.S. -, 125 S.Ct. 310, 160 L.Ed.2d 221 (2004), we affirm the District Court’s holding that FAIR’S standing was proper for the reasons it provided. FAIR, 291 F.Supp.2d at 285-91.
While the Government does not concede that the non-FAIR plaintiffs had standing, the presence of one plaintiff with standing is sufficient to satisfy that requirement. Bowsher v. Synar, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

. Our dissenting colleague urges us to begin our analysis with the presumption that congressional statutes are constitutional. It is a fundamental canon of statutory construction that, when there are " 'two possible interpretations of a statute, by one of which it would unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.' " Rust v. Sullivan, 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (quoting Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927)). But in this case it is not argued that there are two possible constructions of the Solomon Amendment. The canons of statutory construction therefore do not apply. Moreover, “although a duly enacted statute normally carries with it a presumption of constitutionality, when a [statute] allegedly infringes on the exercise of [Fjirst [A]mendment rights, the statute’s proponent bears the burden of establishing [its] constitutionality.” ACORN v. City of Frontenac, 714 F.2d 813, 817 (8th Cir.1983) (citing Org. for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971)).

. As the District Court noted, the Supreme Court's exception to the unconstitutional conditions doctrine for selective spending programs does not apply here. FAIR, 291 F.Supp.2d at 299-300. When the Government appropriates for a particular spending program, it may endorse one viewpoint over another by conditioning its spending on certain criteria. United States v. Am. Library Assn, 539 U.S. 194, 211, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (providing library assistance funds to only those libraries who agree to block obscene Internet sites); Rust, 500 U.S. at 192-93, 111 S.Ct. 1759 (funding family planning services that eschew abortion counseling). In those cases, "the Government [was] not denying a benefit to anyone, but [was] instead simply insisting that public funds be spent for the purposes for which they were authorized.” Rust, 500 U.S. at 196, 111 S.Ct. 1759; see also Am. Library Assn, 539 U.S. at 211, 123 S.Ct. 2297. That exception does not apply in our case because the Solomon Amendment does not create a spending program; it merely imposes a penalty-the loss of general funds.

. FAIR also argues that the Solomon Amendment and the then-existing informal policy are void under the First Amendment’s vagueness doctrine because they provide insufficient notice as to what activities will trigger funding penalties. But the statutory amendment enacted during FAIR’S pending appeal, see supra Part I.C, has rendered moot both the challenge to the Solomon Amendment, see Black United Fund of N.J., Inc. v. Kean, 763 F.2d 156, 160 (3d Cir.1985), and the challenge to the regulatory policy, see Prometheus Radio Project v. FCC, 373 F.3d 372, 396 (3d Cir.2004). The recent amendment to the Solomon Amendment does not, however, moot FAIR’S other challenges to it. See Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (stating that a challenge to a statute is not moot when the new version of it “disadvantages [appellants] in the same fundamental way”).

. Furthermore, the Solomon Amendment requires law schools to do more than passively accept the presence of an "unwanted periodic visitor.” They must actively assist military recruiters in a manner equal in quality and scope to the assistance they provide other recruiters. 10 U.S.C. § 983(b)(1).

. Dale may appear to depart from prior Supreme Court jurisprudence in this area. In two expressive association cases from the 1980s, the Court considered the claims of civic associations that state statutes forcing them to accept women as members violated their expressive association rights. Bd. of Dirs. of Rotary Int’l v. Rotary Club of Duarte, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Closer review explains the distinction from Dale. In both cases the Court examined the organizations’ expressive charitable and humanitarian purposes and determined that they would not be impaired by the forced inclusion of women members. Duarte, 481 U.S. at 548-49, 107 S.Ct. 1940; Roberts, 468 U.S. at 626-27, 104 S.Ct. 3244. The difference in outcome between these cases and Dale -the civic associations had to admit women, but the Boy Scouts did not have to admit Dale-underscores the significance of the Court's decision to extend "deference to an association’s view of what would impair its expression.” 530 U.S. at 653, 120 S.Ct. 2446.
Moreover, we note that the Supreme Court had previously extended deference to what an expressive association said would impair its expression. E.g., Meyer v. Grant, 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("The First Amendment protects appel-lees’ right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.”); Democratic Party v. Wisconsin ex rel. La Follette, 450 U.S. 107, 123-24, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) ("[A] court[] may not constitutionally substitute its own judgment for that of the Party. A political party’s choice among the various ways of determining the makeup of a State's delegation to the party’s national convention is protected by the Constitution.”).

. Furthermore, the law schools are entitled to at least as much deference as the Boy Scouts, as the Supreme Court has recognized *234 in other contexts that universities and law schools "occupy a special niche in our constitutional tradition,” Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), because of their "vital role in ... democracy,” Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). The Court has acknowledged the importance of "autonomous decisionmaking by the academy.” Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); Sweezy, 354 U.S. at 263, 77 S.Ct. 1203 (Frankfurter, J., concurring) (recognizing “four essential freedoms” of a university "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study”). The Supreme Court's academic freedom jurisprudence thus underscores the importance of Dale deference in our case.

. The District Court rejected FAIR’S argument that strict scrutiny applies because it did not believe that the Solomon Amendment directly burdens expressive association rights. FAIR, 291 F.Supp.2d at 310-311. But because we concluded at step two that the Solomon Amendment impairs law schools’ expression, strict scrutiny will apply. Dale, 530 U.S. at 659, 120 S.Ct. 2446 (rejecting the argument that only intermediate scrutiny should apply); The Circle School, 381 F.3d at 182 (applying strict scrutiny to statute impairing schools' expressive association rights by requiring them to lead the Pledge of Allegiance and National Anthem).

. Our colleague in dissent states that "[w]e do not write on a clean slate regarding the importance Congress places in access to college and university facilities by the military” and that "[w]e have already decided that issue contrary to the argument pressed by Appellants.” In United States v. City of Philadelphia, 798 F.2d 81 (3d Cir.1986), our Court acknowledged that "Congress considers access to college and university employment facilities by military recruiters to be a matter of paramount importance.” Id. at 86. City of Philadelphia, however, is distinguishable from this case in two important respects. First, in that case the university invited the military recruiters on campus; the recruiters' presence was not effectively dictated by a statute, as is the case here. Id. at 83. Second, City of Philadelphia engaged in a conflict preemption analysis and held that, because it was not possible for the university to comply with both a Philadelphia anti-discrimination ordinance and the clear congressional policy concerning military recruitment on campus, the ordinance was preempted. Id. at 88-89. Our Court did not reach a balancing-of-interests inquiry. Therefore, neither this Court’s prior acknowledgment of the importance Congress places on military recruiting on college and university campuses, nor our presumption in this case that there is an important governmental interest in attracting talented lawyers to the military, ends our analysis. Rather, we must go on to reach an issue that was not present in City of Philadelphia -whether the Solomon Amendment is narrowly tailored to achieve the Government’s ends.

. See, e.g., FAIR, 291 F.Supp.2d at 282 (describing record evidence of student protests over military recruiting).

. The dissent, applying the balancing-of-interests test from Roberts, 468 U.S. at 620, 104 S.Ct. 3244, comes to the opposite conclusion-"that the law schools' interests here fall at the remote extreme of Justice Brennan's spectrum-'where that relationship’s objective characteristics locate it ... [near] the most attenuated of personal attachments.' " This balancing test, however, comes not from the portion of Roberts dealing with freedom of expressive association, but from the portion dealing with freedom of intimate association. The law schools are clearly not intimate associations, and where they may fall on the spectrum articulated by Justice Brennan for determining whether particular relationships merit protection under that doctrine is irrelevant to our analysis here. In Roberts, the Court went on to engage in a strict scrutiny expressive association analysis and applied the balancing test we apply here, determining that the Government had a compelling interest in eliminating discrimination and that the statute at issue was the least restrictive means of achieving that end. Roberts, 468 U.S. at 620, 104 S.Ct. 3244.

. We note that the subsidization line of compelled speech case law is the only one of these three categories addressed by the dissent.

. For example, most recruiters submit a National Association for Law Placement ("NALP") form that, as NALP puts it, "offers employers a thorough yet succinct way to tell their story to candidates” and includes a "narrative” section to "discuss the special characteristics” of the employer. NALP compiles these forms into a directory, which is distributed and/or made available by both law schools and employers to prospective employees.

. See JA107 (former ROTC student who had "wanted to be an officer in the JAG Corps since high school” interviewed with militaiy recruiter, admitted his homosexuality, and was told that he was "ineligible due to his sexual orientation”).

. While we recognize that the relative cost of providing these services to one particular employer is marginal, the Supreme Court has never required that compelled subsidies be substantial to present a constitutional concern. See, e.g., United Foods, 533 U.S. at 408, 121 S.Ct. 2334 (mushroom assessment at issue was one cent per pound and only some of it was going toward the objectionable advertising).

. While the newspapers could avoid triggering the penalty of having to provide editorial page space to assailed candidates by not criticizing any candidates at all, the Court noted that this self-censorship was a form of speech suppression, itself a First Amendment injury. 418 U.S. at 257, 94 S.Ct. 2831. Our case presents this self-censorship concern as well, as the law schools could avoid triggering-or at least minimize-the quality and scope of active assistance they must provide to military recruiters by limiting the quality and scope of their assistance to other recruiters.

. The Supreme Court has expressed concerns about misattribution and ability to disclaim in several of its compelled speech cases. See Hurley, 515 U.S. at 576-77, 115 S.Ct. 2338 (noting that parade organizers do not customarily “disavow 'any identity of viewpoint’ between themselves and the selected participants” and that "such disclaimers would be quite curious in a moving parade”); Turner Broadcasting System v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("TBS”) (noting that regulations requiring cable operators to cariy broadcast signals posed little risk of misattribution because broadcasters are required by federal regulation to identify themselves at least once every hour); PruneYard Shopping Center v. Robins, 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (suggesting that there was no risk that the message of students distributing political pamphlets and conducting a petition drive at a shopping mall would be attributed *242 incorrectly to the mall owner and noting that tire mall owner could disavow any connection with the message by posting signs near the petition table).
But in none of these cases did the Court hold that the risk of misattribution and the speaker’s ability to disclaim the message were dispositive elements of the compelled speech doctrine. In Hurley, the Court noted that it was not "deciding on the precise significance of the likelihood of misattribution” and did not rest its holding on the parade organizer’s presumed difficulty in disclaiming the gay marchers' message. 515 U.S. at 517, 115 S.Ct. 2310. And in both PruneYard and TBS the absence of a risk of misattribution was only one of a number of factors distinguishing them from prior cases in which compelled speech had been found. PruneYard, 447 U.S. at 87, 100 S.Ct. 2035; TBS, 512 U.S. at 654-55, 114 S.Ct. 2445. The Court also considered the content-neutral nature of the law causing the challenged "compelled” speech, the nonexistent risk of self-censorship, and the unique characteristics of the forum (the Court later described the shopping mall in PruneYard as a "peculiarly public” forum, see Pacific Gas, 475 U.S. at 13 n. 8, 106 S.Ct. 903; the TBS Court noted cable’s monopoly status and exclusive control over the "essential pathway” for disseminating a particular type of communication). TBS, 512 U.S. at 654-56, 114 S.Ct. 2445; PruneYard, 447 U.S. at 87-88, 100 S.Ct. 2035. And while Prune-Yard comes closest to holding that a speaker's ability to disclaim a message may be relevant to the compelled speech analysis, it is notable that PruneYard predated Pacific Gas, the most express rejection of the ability to disclaim as an antidote for compelled speech. Pacific Gas, 475 U.S. at 15 n. 11, 106 S.Ct. 903 (plurality opinion) ("The presence of a disclaimer ... does not suffice to eliminate the impermissible pressure on the appellant to respond to [the unwanted] speech....”).

. While the expressive content of the law schools’ message is relevant also to the law schools' expressive association claim under Dale, the analysis is different in that context. Under the rubric of expressive association, we consider whether the Solomon Amendment interferes with the law schools' extant message of nondiscrimination, and thus impinges their associational freedom, by compelling them to assist in the military's recruitment efforts. But with expressive conduct we ask whether resistance to the statute, i.e., exclusion of the recruiters in contravention of the statute (or its flip side, "the conduct of law schools in permitting or assisting a recruiting activity,” FAIR, 291 F.Supp.2d at 309), is itself expressive conduct warranting First Amendment protection.

. As noted in Johnson, id.., the Supreme Court has recognized the expressive nature of students’ wearing of black armbands to protest the war in Vietnam, Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); of a sit-in by black citizens in a segregated area, Brown v. Louisiana, 383 U.S. 131, 141-142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, Schacht v. United States, 398 U.S. 58, 90 S.Ct. 1555, 26 *244 L.Ed.2d 44 (1970); and of picketing in support of a wide variety of causes, see, e.g., Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 313-314, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

. The Government quotes Nixon v. Shrink Missouri Gov’t PAC, 528 U.S. 377, 378, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), for the proposition that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.” But this is not a case where the Government has presented less evidence than might otherwise be required; here the Government has presented no evidence.

. We note that this is not a case involving military discretion to determine whether internal policies are necessary and appropriate. Cf. Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (''[T]he military is, by necessity, a specialized society separate from civilian society” (citation omitted)). On the contrary, this case involves the military's compelled presence on the campuses of civilian institutions.